# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 15, 2023

Lyle W. Cayce
Clerk

No. 21-30210

Andrea Armstrong, Executrix of the Estate
of Glenn Ford,

*Plaintiff—Appellant*,

*versus*

Don Ashley; Gary Alderman; Gary Pittman; Everett T.
Rushing; Billy Lockwood; Frank Datcher; Glynn
Mitchell; Rodney Price; the City of Shreveport; Caddo
Parish District Attorney James Stewart; the Estate of
George McCormick,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:15-CV-544

Before Jones, Southwick, and Oldham, *Circuit Judges*.

Edith H. Jones, *Circuit Judge*:

Isadore Rozeman was shot and killed in his jewelry shop in 1983, and Glenn Ford was sentenced to death for the crime. Thirty years later, Louisiana vacated Ford's conviction because new evidence identified the real murderer. After his release from prison, Ford filed this § 1983 suit seeking damages from police officers, prosecutors, and the local government for

suppressing, fabricating, and destroying evidence. Ford died shortly thereafter, leaving Armstrong as the executrix of his estate. In 2021, the district court dismissed Armstrong's amended complaint in its entirety based on FED. R. CIV. P. 12(b)(6) as to some defendants and 12(c) as to others. The district court correctly dismissed nearly all of the claims, including a constitutional malicious prosecution claim, which, at the time suit was filed, was not cognizable in the Fifth Circuit. *See Castellano v. Fragozo*, 352 F.3d 939, 953–54 (5th Cir. 2003) (en banc). But this year, the Supreme Court held that such claims do in fact emanate from the Fourth Amendment. *See Thompson v. Clark*, 142 S. Ct. 1332, 1338 (2022). Nevertheless, the district court properly dismissed the constitutional malicious prosecution claim for the same reasons it dismissed Armstrong's Louisiana malicious prosecution claim.

Accordingly, we AFFIRM.

## I. Background

Ford was quickly arrested and charged with Rozeman's murder. He was convicted of capital murder, and his conviction and sentence were affirmed on direct appeal. *See State v. Ford*, 489 So. 2d 1250, 1257 (La. 1986).

In 1992, Ford sought state post-conviction relief on the grounds that his counsel was ineffective, exculpatory evidence was suppressed, and he was actually innocent. The Louisiana Supreme Court denied relief. Ford next filed a federal habeas corpus petition in 2012. *See Ford v. Cain*, No. 5:12-cv-00350 (W.D. La. filed Feb. 4, 2012).

While that petition was pending, the State moved to vacate Ford's conviction and sentence based on "credible evidence" that "Ford was neither present at, nor a participant in, the robbery and murder of Isadore Rozeman." Ford was released from prison on March 11, 2014. In a joint motion to dismiss his federal habeas petition, Ford explained that state filings

No. 21-30210

"indicated that an individual named Jake Robinson confessed to an informant for the Caddo Parish Sheriff's Office that he—not Mr. Ford—shot and killed Isadore Rozeman." *Ford v. Cain*, No. 5:12-cv-00350, ECF. No. 62 (W.D. La. Mar. 14, 2014).

Later that same year, Ford filed a state court petition seeking compensation under LA. REV. STAT. 15:572.8 for his wrongful conviction. *See State v. Ford*, 193 So. 3d 1242 (La. App. 2 Cir. 2016). The state court denied relief because Ford could not prove "factual innocence," that he did not "commit any crime based upon the same set of facts used in his original conviction." LA. REV. STAT. 15:572.8(B). The court found that Ford, though not the triggerman, was intimately involved with Rozeman's robbery and murder.

Specifically, there was "overwhelming evidence of Ford's knowledge of and involvement in the criminal activity that day and night: his participation in selling the stolen property from the robbery; his acting as a lookout; meeting with Jake Robinson and Henry Robinson before and after the crime; and his attempts to procure buyers for the probable murder weapon." *Ford*, 193 So. 3d at 1254. Because he "failed to disprove that he committed the crimes of possession of stolen goods, accessory after the fact[,] and being a principal to the armed robbery," Ford was denied compensation.[1] *Id*.

---

[1] Two concurring judges noted that based on Ford's involvement with the armed robbery leading to Rozeman's murder, Ford could likely have been convicted for felony murder under Louisiana law as it stood in 1983, which was punishable by life without parole.

> What this means is that Ford arguably committed second degree murder arising out of the facts of this case. Had he actually been convicted of that crime, in a petit jury trial conducted in accordance with the Sixth Amendment to the United States Constitution, Ford would have never been released from prison.

No. 21-30210

While his compensation case was pending, Ford filed this lawsuit in March 2015. Ford died three months later, and the executrix of his estate, Andrea Armstrong, was substituted. Eleven defendants named in the Complaint are parties to this appeal. Armstrong does not appeal the district court's dismissal of other defendants. Eight of the appellee–defendants, collectively the "Law Enforcement Defendants," are current or former Shreveport Police officers.[2] The ninth appellee is the estate of George McCormick, Caddo Parish's former coroner. The final two appellees are the City of Shreveport and current Caddo Parish District Attorney James Stewart. Armstrong alleged that the Law Enforcement Defendants suppressed or destroyed exculpatory evidence, such as investigative reports corroborating Ford's story and implicating other suspects, and fabricated testimony implicating Ford. Armstrong also asserted *Monell*[3] claims against Shreveport and the Caddo Parish DA[4] based on unconstitutional investigative practices.

The Caddo Parish DA and McCormick's estate filed Rule 12(b)(6) motions. Granting both motions, the district court found that Armstrong failed to establish an official policy or custom of the DA's office as required for *Monell* liability, and the claims against McCormick were barred by absolute immunity.

---

*Ford*, 193 So. 3d at 1258 (Drew, J., concurring in the Opinion on Rehearing Grant); *accord id.* at 1256–57 (Brown, C.J., concurring in the Opinion on Rehearing Grant).

[2] Those appellants are Ashley, Alderman, Pittman, Rushing, Lockwood, Datcher, Mitchell, and Price.

[3] *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978).

[4] "Louisiana law does not permit a district attorney's office to be sued in its own name." *Hudson v. City of New Orleans*, 174 F.3d 677, 680 (5th Cir. 1999). Thus, when attempting to sue a Louisiana DA's office under *Monell*, the current DA, rather than the office, is the proper defendant. *Id.* Any former DA's actions at the time of Ford's prosecution are imputed to the current DA for purposes of *Monell*.

4

No. 21-30210

The Law Enforcement Defendants and Shreveport answered the Complaint on December 3, 2015. The Law Enforcement Defendants then filed a separate Rule 12(b)(6) motion, which the court denied as untimely. The Law Enforcement Defendants' appeal of this order was dismissed for lack of jurisdiction. *Armstrong v. Ashley*, 918 F.3d 419, 423 (5th Cir. 2019).

The Law Enforcement Defendants and Shreveport then moved for judgment on the pleadings under Rule 12(c) in April 2019.[5] The district court ordered Armstrong to file a Rule 7(a) reply.[6] After Armstrong did so, the Law Enforcement Defendants and Shreveport re-urged their Rule 12(c) motions. The district court granted the Rule 12(c) motions in part on April 1, 2021.[7]

The district found that Armstrong had not plausibly pled *Monell* claims against Shreveport because she did not identify a particular policymaker or explain how the City was made aware of its employees' alleged misconduct. The court also held that Armstrong's claims against the Law Enforcement Defendants failed because Armstrong did not plausibly allege any individual officer's violation of Ford's constitutional rights.

Armstrong timely appealed.

---

[5] Because the district court denied the Law Enforcement Defendants' Rule 12(b)(6) motion on procedural rather than substantive grounds, the district court was free to consider the adequacy of the pleadings afresh upon a procedurally proper Rule 12(c) motion. *See Armstrong*, 918 F.3d at 423.

[6] Rule 7(a) lists the only seven pleadings that are allowed. The seventh is "a reply to an answer," "if the court orders one." Fed. R. Civ. P. 7(a). When ordering the reply here, the district court instructed Armstrong to address specifically the defendants' qualified immunity defenses.

[7] The district court denied the Rule 12(c) motions insofar as they required the court to decide claims of *respondeat superior* liability and indemnification against Shreveport under Louisiana law. The district court entered partial final judgment under Rule 54(b), and dismissed the indemnification claim against Shreveport without prejudice to reinstating it if its judgment is reversed on this appeal.

No. 21-30210

## II. Standard of Review

This court reviews the grant of Rule 12(b)(6) and Rule 12(c) motions *de novo*. *Gentilello v. Rege*, 627 F.3d 540, 543 (5th Cir. 2010). In conducting that review, the court accepts all well-pled facts as true, drawing "all reasonable inferences in favor of the nonmoving party." *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1162–63 (5th Cir. 2021) (*quoting Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc)). But the court does not "presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement." *Id.*

## III. Discussion

There are two groups of defendants. The first includes the Law Enforcement Defendants and the coroner, and the second consists of the local entities and the District Attorney facing allegations of *Monell* liability. We discuss first the Law Enforcement Defendants and coroner, then questions of *Monell* liability, and then Armstrong's constitutional and Louisiana malicious prosecution claims, and last, Armstrong's additional federal and state claims.

a. *The Law Enforcement Defendants*

Qualified immunity protects the Law Enforcement Defendants so long as their individual conduct did not violate clearly established constitutional rights. *See Harmon*, 16 F.4th at 1163. When a defendant asserts qualified immunity, the burden is on the plaintiff to plead facts that show why immunity is inapplicable. *See Waganfeald v. Gusman*, 674 F.3d 475, 483 (5th Cir. 2012). Armstrong's pleadings of conclusory statements, naked assertions, and threadbare recitals fail to plausibly show violations by these defendants of Ford's clearly established constitutional rights.

6

No. 21-30210

i. *Due process claims*

Armstrong alleges that the Law Enforcement Defendants suppressed thirteen exculpatory police reports.[8]  Armstrong describes each report in some detail in her amended complaint and Rule 7(a) response.  But other than providing ample descriptions of their contents, Armstrong's assertions about constitutional violations surrounding the reports are formulaic.  A pleading's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007) (citation omitted).  But conclusory assertions, including "conclusory allegation[s] of agreement at some unidentified point," do not qualify as well-pled factual allegations.  *Id.* at 557, 127 S. Ct. at 1966.  Moreover, well-pled facts that are "merely consistent with" an entitlement to relief, that is, equally suggestive of legal and illegal conduct, do not suffice. *Id.*  The complaint must allege facts "plausibly suggesting" illegal conduct such that the allegations are no longer in "neutral territory."  *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1950 (2009) ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (quotation omitted)).

---

[8] The "suppressed" reports consisted of a report suggesting Mr. Rozeman was killed after 2:30pm; a report documenting a conversation between one of the defendants and a witness who said he saw a "black man" that was not Ford near Rozeman's shop at the time of the murder; several reports identifying alternate suspects; a report documenting interviews with children; a report documenting interviews with witnesses Norma Roach and Jean Whatley; a report documenting the defendants' interviews with children; two reports documenting an interview and photo line-up with witness Michael Thornton; a report documenting another witness's photo identification attempts; a report describing Jake and Henry Robinson as "the two prime suspects"; and another report with additional information on Jake and Henry Robinson.

No. 21-30210

The first of the thirteen allegedly "suppressed" reports described Rozeman's murder as occurring late in the day, a time for which Armstrong had an alibi. Armstrong asserts that the Law Enforcement Defendants "knowingly and deliberately failed to provide these reports to Mr. Ford, his defense attorneys, or prosecutors," and that Ford would have used the reports to impeach witnesses. This language is found throughout Armstrong's complaint and Rule 7(a) Reply and is repeated for all of her claims of "suppression." Additionally, for every report but the first, Armstrong includes language accusing all or a subset of the Law Enforcement Defendants of "communicating" with each other about "the existence of this information and the problem it posed for their plan to implicate Mr. Ford."

The district court correctly found that these conclusory allegations of suppression do not pass muster under governing law. A pleading that only contains "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" does not meet the standards of Rule 8(a)(2). *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (*citing Twombly*, 550 U.S. at 555, 127 S. Ct. at 1959). Armstrong's pleadings consist almost entirely of such formulaic recitations. She could have identified each witness Ford would have impeached with the reports, which testimony the jury likely would have discredited, and which defendant was responsible for suppressing each report. But based upon nothing more than Armstrong's barebones recitals, these ill-pled claims of suppression by the named defendants are factually insufficient.

Armstrong's only non-conclusory factual allegation of suppression is that Ford and his counsel did not receive the reports during Ford's trial. But this fact is fatal to Armstrong's claim, because it is just as consistent with *Brady* violations solely accomplished by prosecutors as it is with police

8

suppression.[9]  *See Twombly*, 550 U.S. at 554, 127 S Ct. at 1964 (holding an antitrust complaint did not plausibly state a claim because it was just as consistent with (lawful) parallel conduct as with (unlawful) agreement in restraint of trade).  Armstrong's allegations do not distinguish the perpetrators.

Armstrong argues that "this Court has held that allegations far less detailed than Plaintiff's suffice to state a due process claim in wrongful conviction cases."  To the contrary, the cases she cites illustrate the greater specificity that attends successful suppression claims.  For example, in *Burge v. St. Tammany Parish*, 187 F.3d 452 (5th Cir. 1999), a wrongfully convicted suspect substantiated a *Brady* claim against a specific police officer by, among other things, presenting testimony from a fellow officer that the defendant had deliberately hidden exculpatory evidence.  *See id.* at 461; *see also Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) (finding sufficiently specific allegations that a lab technician concealed the exculpatory results of blood tests); *Good v. Curtis*, 601 F.3d 393, 396 (5th Cir. 2010) (holding a fabrication claim adequate which detailed that defendant "repeatedly altered the light settings on the camera with each picture in an effort to make Good's photograph better match the 'dark tan' skin tone of the suspect in the police sketch").

Armstrong also argues that because she alleges the suppression of numerous items of evidence, less detail should be required as to the particular mechanics by which each item was suppressed.  Armstrong principally cites

---

[9] "The Supreme Court held in *Brady v. Maryland* that a criminal prosecutor's failure to disclose exculpatory evidence to a criminal defendant violates a defendant's right to a fair trial.  A police officer's deliberate concealment of exculpatory evidence violates this same right, and can give rise to liability under § 1983." *Brown v. Miller*, 519 F.3d 231, 237–38 (5th Cir. 2008) (citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963) and *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988)).

No. 21-30210

*Wearry v. Cain*, 577 U.S. 385, 136 S. Ct. 1002 (2016), which faulted the lower court's resolution of a *Brady* claim for "evaluat[ing] the materiality of each piece of evidence in isolation rather than cumulatively." *Id.* at 394. The Supreme Court's statement is binding but inapposite, because the critical issue here is not the materiality of the reports, but why Ford's counsel did not receive the reports before trial. Without pleading details about how and by whom each of the reports was suppressed, Armstrong cannot rely on the numerosity of the reports (irrespective of their materiality) to cure those deficiencies and seek damages.

ii. *Fabricated evidence claims*

Armstrong alleges that two of the Law Enforcement Defendants, Ashley and Alderman, fabricated evidence by obtaining false statements incriminating Ford from Marvella Brown, Donnie Thomas, and Chandra Nash.

The Marvella Brown Statement is the most substantial of Armstrong's fabrication allegations. Armstrong alleges that "Defendants Ashley and Alderman fed information about the murder to Ms. Brown in order to frame Mr. Ford for the crime." In this allegedly fabricated statement:

> Ms. Brown said that Mr. Ford had arrived at her apartment around noon on the day of the Rozeman murder and left with the Robinsons, only to return with a sack containing jewelry. In this fabricated statement, Mr. Ford carried a .22 pistol and Jake Robinson had a .38 revolver.

Armstrong then alleges that this statement was used against Ford at his trial. Moreover, Armstrong alleges that "Marvella Brown later acknowledged that Defendants Ashley and Alderman had fabricated aspects of this statement"; "[i]n May 1984, Marvella Brown recanted her statement to Defendants Ashley and Alderman"; and "Ms. Brown's recantation was documented in

a police report dated May 6, 1984."

Brown's alleged "recantation" is a factual assertion that Ashley and Alderman fabricated this statement. Yet the Amended Complaint and Reply provide no details about the alleged "recantation," other than that it happened, that it involved "aspects" of her statement, and was documented in a police report. No doubt that is because the details of the recantation are fatal to Armstrong's fabrication claim. The police report notes that Brown visited Alderman and claimed that "she had made a mistake" about Jake Robinson being at her house on the day of the murder.[10] But Brown did not discuss Ford, nor does the report suggest that she recanted the statements that (1) Ford had returned with a sack of jewelry, (2) Ford arrived at her apartment around noon on the day of the murder and left with the Robinsons, and (3) Ford carried a .22 pistol. If fabrication occurred, Armstrong does not allege how it was material or harmful to Ford's case.

Viewed in the context of the May 6, 1984, police report, Armstrong's assertion that Ashley and Alderman fabricated Brown's testimony does not undermine her statements about Ford and is conclusory as to the officers' unconstitutional conduct against Ford. Because the allegations do not "plausibly suggest" that fabrication actually occurred as to the incrimination of Ford, the district court properly dismissed this claim. *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966.

---

[10] This police report was attached to the Law Enforcement Defendants' Rule 12(c) motion as an exhibit. Because this report is central to the allegations in the Complaint and Reply, this court may consider it. *See Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (when ruling on a Rule 12 motion, a court may consider "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim"). This is not a case like *Peña v. City of Rio Grande City*, where the plaintiff's "complaint expressly reject[ed] those elements of the police report that conflict[ed] with her account." 879 F.3d 613, 620 n.9 (5th Cir. 2018).

No. 21-30210

Regarding Donnie Thomas, Armstrong's allegations are as follows:

> Donnie Thomas had been arrested by Defendant Pittman in connection with the possession of some jewelry which had been stolen from Mr. Rozeman's shop the month before he was killed.

> At some point after Defendant Pittman arrested Donnie Thomas and prior to February 2, when Defendants Ashley and Alderman spoke with Thomas, Defendants Pittman, Ashley and Alderman communicated together and came up with a plan to use Thomas and his connection to Rozeman in order to fabricate evidence to implicate Mr. Ford in the Rozeman murder.

> Defendants Ashley and Alderman then spoke with Thomas, and claimed that Thomas gave a statement to them that implicated Mr. Ford in Rozeman's murder.

> This statement, in a similar manner to the purported statement from Marvella Brown, was fed to Mr. Thomas by Defendants Ashley and Alderman to frame Mr. Ford. And in a similar manner as they did with the Brown statement, Defendants suppressed the fabrication of the Thomas statement.

These allegations are devoid of supporting factual detail that could render them plausible. Armstrong does not explain how the statement implicated Ford, or why she believes it to be fabricated, or how the statement was used against Ford. The district court properly dismissed this claim because it lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 677, 129 S. Ct. at 1949.

Armstrong's allegation that Chandra Nash's statement was largely fabricated is barebones. She alleges:

> [B]ecause the report [discussing Chandra Nash's statement] was suppressed, one or more of Defendants Ashley, Alderman, Price, Mitchell, Datcher, Lockwood, Pittman, and Rushing

12

were able to coerce or otherwise convince Chandra Lisa Nash to change her story, fabricating a false statement from her that purported to identify Mr. Ford as being near the scene of the crime close in time to the murder, which was used against Mr. Ford at his criminal trial.

Armstrong does not identify which of the eight Law Enforcement Defendants fabricated Nash's statement and does not provide any factual detail plausibly suggesting that Nash's statement was in fact fabricated. Based on her failure to name a perpetrator and the conclusory allegation of fabrication, the district court properly dismissed this claim.

### iii. *Fingerprint evidence*

Armstrong also alleges that Sgt. Lockwood, the Law Enforcement Defendant who obtained and analyzed the relevant fingerprint evidence, destroyed exculpatory fingerprint evidence, fabricated incriminatory fingerprint evidence, and also suppressed evidence that other suspects shared the "whorl" pattern print found on the bag.

A Due Process Clause claim for destruction of evidence (or failure to preserve evidence) requires a showing that evidence was destroyed and that the government official acted in bad faith. *See Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 337 (1988) (holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"); *United States v. Gibson*, 963 F.2d 708, 711 (5th Cir. 1992) ("The destruction of evidence alone does not constitute a due process violation; the defendant must also show bad faith on the part of the government officials."). Although Armstrong makes conclusory references to Lockwood's "destruction of evidence," her factual allegations concern a failure to preserve evidence, rather than destruction. Specifically, Armstrong alleges that Lockwood "fail[ed] to take a photograph of the fingerprint he

supposedly developed," did "not properly preserv[e] the paper bag as evidence," "failed to document and preserve where the print was allegedly found on the paper bag," and used an improper "method . . . to process the bag for prints." And Armstrong's only allegation of bad faith is that "[t]his destruction of evidence was done in bad faith by Defendant Lockwood because he was not interested in pursuing a legitimate investigation designed to reveal the truth, which would have exculpated Mr. Ford."

Because Armstrong provides no facts supporting her conclusory allegation of bad faith, which, as an allegation of subjective intent, need not be accepted as true, her "destruction" claim against Lockwood is insufficiently pled. *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1164 n.2 (5th Cir. 2021) (*citing Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949). And Armstrong cites no authority suggesting that a plaintiff can state a claim for "destruction" of evidence by merely pointing to potentially useful evidence, claiming it was improperly preserved, and then alleging bad faith without factual support.[11] Instead, the thrust of the Court's reasoning in *Youngblood* is that courts should weed out such claims because of the difficulty of "imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." 488 U.S. at 58, 109 S. Ct. at 337.

Armstrong's fabrication allegations against Lockwood consist of the

---

[11] Armstrong argues that because "Lockwood would have known the fingerprint was exculpatory, . . . a bad faith allegation is not required." This rule conflicts with *Youngblood*, and neither of Armstrong's cited cases is apposite. *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528 (1984), was decided before *Youngblood* and, regardless, announces no such rule. *See id.* at 488–89. *United States v. Swenson*, 894 F.3d 677 (5th Cir. 2018), simply announced the normal rule for *Brady* violations involving the withholding or suppressing of evidence. *Id.* at 683. It did not address claims for failure to preserve evidence.

following:

> Because Defendant Lockwood had deliberately destroyed the underlying forensic evidence, . . . he was free to fabricate false fingerprint evidence against Mr. Ford, because there was no remaining physical evidence that could contradict him. Thus, Defendant Lockwood fabricated false evidence against Mr. Ford by claiming that he had found, processed and observed a latent fingerprint on the paper bag that had a whorl pattern that implicated Mr. Ford. In fact, Defendant Lockwood later admitted that he had not seen the center of the fingerprint, making any attempt to classify the fingerprint as a whorl pattern and to link it to Mr. Ford on that basis totally baseless. Instead, Defendant Lockwood simply made up this piece of supposed evidence in order to wrongly implicate Mr. Ford.

Armstrong alleges that Lockwood "claim[ed]" to have found a print that implicated Ford, and "simply made up this piece of supposed evidence." Armstrong's failure to allege how or where Lockwood made this "claim" is fatal. *See Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965 (claim must present "enough factual matter (taken as true) to suggest" an entitlement to relief). To the extent that Armstrong's claim refers to Lockwood's testimony at trial, it is barred by absolute immunity. *See Mowbray v. Cameron Cnty., Tex.*, 274 F.3d 269, 277 (5th Cir. 2001) ("[W]itnesses are entitled to absolute immunity against § 1983 suits based on their testimony in a criminal trial.").

Finally, Armstrong alleges that:

> Defendants suppressed exculpatory evidence that any whorl pattern fingerprint on the paper bag, as claimed by Defendant Lockwood, likely came from another source. Whorl patterns are found on approximately 35% of people. One or more of Defendants Ashley, Alderman, Price, Mitchell, Datcher, Pittman, Lockwood, and Rushing were aware that three other suspects had whorl pattern fingerprints, but knowingly and deliberately failed to provide this information to Mr. Ford, his defense attorneys, or prosecutors in advance of or during Mr. Ford's criminal trial. This suppression was especially detrimental to Mr. Ford because the State argued at trial that no other suspect had whorl-patterned fingerprints.

This allegation suffers from the same problem as the suppression allegations previously discussed. Armstrong's factual allegations, taken as true, are equally consistent with prosecutorial *Brady* violations as with police suppression. Armstrong's account thus "stays in neutral territory" and cannot satisfy Rule 8's requirements. *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966.

Armstrong's allegation also suffers from the distinct problem of group pleading: she simply faults the eight Law Enforcement Defendants as a group without factual material suggesting that any particular defendant suppressed evidence. Armstrong's allegation is independently insufficient for that reason since a § 1983 plaintiff "must plead that each Government-official defendant, though the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676, 129 S. Ct. at 1948; *cf. Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) ("[W]e do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the [illegal conduct] is specifically pled."). The district court thus properly

dismissed claims relating to the fingerprint evidence.

### iv. *Claims against the coroner*

George McCormick, as the coroner of Caddo Parish at the time of trial, testified for the prosecution as an expert witness on forensic pathology. But McCormick never examined Rozeman's body, and he was not the coroner at the time of Rozeman's murder. Armstrong sued him in his personal capacity, and after McCormick died, continued the suit against McCormick's estate.

Almost all of Armstrong's allegations concerning McCormick relate to his testimony. She asserts that he "delivered opinions on two crucial issues: the gunman's dominant hand and the victim's time of death." She alleges he fabricated evidence that the murderer was left-handed (which would implicate Ford but not the Robinson brothers), and that the murder happened earlier in the day. She also alleges that McCormick "testified that 'it was his expert opinion that a duffel bag was placed over Mr. Rozeman's head to muffle the gunshot and to shield the murderer from blood spatter.'" (alterations omitted). Finally, she alleges that another forensic pathologist demonstrated the fabrication of these claims during post-conviction proceedings. The only other allegation against McCormick is the conclusory statement that "[h]e was involved in the unlawful investigation and conviction of Plaintiff."

Claims against McCormick predicated on his trial testimony are barred by absolute immunity. *See Briscoe v. LaHue*, 460 U.S. 325, 326, 103 S. Ct. 1108 (1983) ("witnesses are absolutely immune from damages liability based on their testimony" and even when "government officials . . . testify about the performance of their official duties"). Accordingly, Armstrong's claims related to McCormick's testimony were properly dismissed.

Armstrong argues in response that because "McCormick fabricated false testimony *before trial*," she seeks to hold him liable for that. She points out that government officials do not get absolute immunity for "fabricat[ing] evidence concerning an unsolved crime." *Rehberg v. Paulk*, 566 U.S. 356, 370 n.1, 132 S. Ct. 1497, 1507 n.1 (2012) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 272–76, 113 S. Ct. 2606, 2615–17 (1993)). And fabrications are not immunized just because the fabricator later presents the false evidence in testimony. *See, e.g.*, *Castellano v. Fragozo*, 352 F.3d 939, 958 & n.107 (5th Cir. 2003), *abrogated in part by Thompson v. Clark*, 142 S. Ct. 1332 (2022).

This argument is meritless. Armstrong is correct that pre-trial evidence of fabrication independent from preparing and delivering testimony is not immunized by later testimony. For example, in *Buckley*, the defendant was not immune when he fabricated evidence and made defamatory public statements in order to get a grand jury to indict a suspect. 509 U.S. at 262–64, 113 S. Ct. at 2609–11. And in *Castellano* (the primary case Armstrong relies on), the defendant police officer was not immune when he solicited false witnesses and altered tape recordings that were later submitted into evidence. 352 F.3d at 943, 958. But Armstrong's allegations do not approach that level of specificity. The only well-pled allegations are that McCormick fabricated "evidence" as to the murderer's handedness and the victim's time of death, the "evidence" being McCormick's trial testimony. Were these allegations sufficient to overcome witness immunity, witnesses would rarely receive immunity from suit. Armstrong cites no authority for such a radical constriction of *Briscoe*'s witness immunity. Therefore, the district court properly dismissed her claims against McCormick.

b. *The City of Shreveport*

Armstrong asserts a number of claims against the City under Section 1983. None is sufficiently pled. First, she claims the City "had an

official policy of pursuing police investigations using unconstitutional methods, including failing to disclose police reports containing exculpatory evidence," coercing witnesses, fabricating and suppressing evidence, and using unreliable identification methods. Her pleadings allege "a systematic pattern of withholding of exculpatory information, fabrication of evidence, coercion, and other illegal tactics, the sum total of which completely corrupted the investigative process." The *Monell* standards for imposing liability on municipal entities must be satisfied.

To find the City of Shreveport liable under *Monell*, Armstrong must identify a policymaker and identify an official city policy that was the moving force behind the alleged constitutional rights violation. *See Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003); *see also Monell*, 436 U.S. at 694, 98 S. Ct. at 2037. An "official policy" means:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc).

Armstrong does not allege that an officially promulgated policy instructed police to investigate using unconstitutional methods. *See Webster*,

735 F.2d at 841. Therefore, she had to rely on a custom or practice "so common and well settled as to constitute a custom that fairly represents municipal policy," and "[a]ctual or constructive knowledge of such custom must be attributable" to the policymaker. *Id.*; *see also Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 396 (5th Cir. 2017) ("A pattern requires similarity, specificity, and sufficiently numerous prior incidents."). As quoted above, Armstrong pled custom or practice and pattern in a conclusory fashion without meaningful factual content. Although Armstrong also alleges that "persons with final policymaking authority for the Shreveport Police Department participated personally in the misconduct described in this Complaint," this, too, is barren of factual support and wholly conclusory. *See Davidson*, 848 F.3d at 395 (discussing liability when "a policymaker performs the specific act that forms the basis of the § 1983 claim").

Second, Armstrong argues that Shreveport failed to adequately train, supervise, and discipline its officers. To survive dismissal on this claim, Armstrong must plead "that (1) the supervisor either failed to supervise or train the subordinate officer; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights, and (3) the failure to train or supervise amounts to deliberate indifference." *Davidson*, 848 F.3d at 397. A plaintiff may show deliberate indifference by demonstrating either that (a) the "municipality had notice of a pattern of similar violations," or (b) "the constitutional violation was the highly predictable consequence of a particular failure to train." *Id.*

Armstrong asserts that Shreveport police officers received subpar training across the board, but this general conclusion is not enough to imply or state that policymakers acted with deliberate indifference. As already discussed, she fails to allege a pattern of similar violations, let alone Shreveport's notice of such a pattern, except in wholly conclusory terms. And she does not point to a "particular failure to train" that could render a

constitutional violation highly predictable. *Id.* This *Monell* claim based on failure to train, supervise, and discipline fails for lack of factual allegations that support a finding of deliberate indifference.[12]

c. *Caddo Parish DA James Stewart*

In the alternative, Armstrong argues that *Monell* liability may be imposed on prosecutors in the Caddo Parish District Attorney's Office because they allegedly suppressed exculpatory evidence pursuant to a policy or custom. James Stewart, the current Caddo Parish District Attorney, stands in as the official defendant.

This claim fails for reasons similar to those that stymie Armstrong's *Monell* claim against Shreveport. Armstrong's allegations of a formal policy and direct policymaker involvement are again entirely conclusory.

> [T]he District Attorney, through its final policymakers, maintained a policy, custom, or pattern and practice of condoning corruption, that included widespread prosecutorial misconduct, including by failing to supervise, discipline, and train its prosecutors. . . .

> Further, upon information and belief, persons with final policymaking authority for the District Attorney participated personally in the prosecution of Plaintiff.

Armstrong's allegations of an unlawful custom or practice include the same formulaic allegations made against Shreveport:

> Despite actual and constructive notice, the District Attorney had a custom, pattern and practice of promoting, facilitating,

---

[12] The district court also dismissed Armstrong's state-law claim that the City of Shreveport and the Parish of Caddo are vicariously liable under the theory of *respondeat superior*. This claim fails if there is no underlying tortious conduct. 12 WILLIAM E. CRAWFORD, LOUISIANA CIVIL LAW TREATISE: TORT LAW § 9.11D (2000). Here, there was none, as this opinion explains.

or condoning improper, illegal, and suppression of exculpatory and impeachment evidence, and failed to adequately supervise, discipline and train its prosecutors.

With this claim, however, Armstrong lists nine cases over a 24-year period as examples where exculpatory evidence was suppressed by the District Attorney's practices. But nine constitutional violations over a 24-year period and thousands of prosecutions are hardly sufficient to show a municipal custom. *See Connick v. Thompson*, 563 U.S. 51, 62, 131 S. Ct. 1350, 1360 (2011) (four *Brady* violations over a ten-year period insufficient to apprise a District Attorney of the need for additional *Brady* training). A more fundamental problem, noted by the district court, is the mischaracterization of these nine cases, none of which found a *Brady* violation. *See, e.g.*, *State v. Palmer*, 344 So. 2d 964, 968 (La. 1977) (finding that the latent fingerprint evidence withheld "was not favorable or exculpatory evidence to which the defense was entitled").[13] This proffered litany cannot constitute a plausible allegation that the Caddo Parish DA's office had a custom of suppressing exculpatory evidence. *See Davidson*, 848 F.3d at 396.

As with her *Monell* claim against Shreveport, Armstrong also alleges failure of the DA's office to adequately train, supervise, and discipline. Just as nine inapposite cases cannot show an unconstitutional custom or pattern, they are insufficient to place the District Attorney on notice as a means to show deliberate indifference. The district court thus properly dismissed

---

[13] Armstrong faults the district court for "looking beyond the pleadings." But doing so was proper because the cases were "referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Scanlan*, 343 F.3d at 536. Armstrong also argues that these cases should have put the District Attorney on notice even though the courts found no *Brady* violations. That is incorrect. In *Palmer*, for example, the District Attorney's office had no obligation to disclose immaterial, non-exculpatory evidence, so that case would have done nothing to alert him to any problem.

Armstrong's *Monell* claims against DA Stewart. *See id.* at 397.

### d. *Malicious Prosecution*

The Supreme Court recently held that litigants may bring a Fourth Amendment malicious prosecution claim under § 1983. *Thompson v. Clark*, 142 S. Ct. 1332, 1337 (2022). The Court identified three minimum elements to common law malicious prosecution claims, "(i) the suit or proceeding was 'instituted without any probable cause'; (ii) the 'motive in instituting' the suit 'was malicious,' which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice; and (iii) the prosecution" terminated in favor of the accused. *Id.* at 1338 (citing T. Cooley, Law of Torts 181 (1880)). The Supreme Court did not, however, lay out a comprehensive list of the elements for a Fourth Amendment malicious prosecution claim, and largely left the question of elements to the lower courts. Thus, the Court declined to decide "whether a plaintiff bringing a Fourth Amendment claim under § 1983 for malicious prosecution must establish malice (or some other *mens rea*) in addition to the absence of probable cause." *Id.* at 1338 n.3.

Nonetheless, two elements are required under *Thompson*. The first is that "[b]ecause a [Fourth Amendment malicious prosecution] claim is housed in the Fourth Amendment, the plaintiff also has to prove that the malicious prosecution resulted in a seizure of the plaintiff." *Id.* at 1337 n.2; *see, e.g.*, *Jones v. York*, 34 F.4th 550, 564 n.8 (7th Cir. 2022). The second is that the traditional favorable termination element of a common law malicious prosecution claim "does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence." *Thompson*, 142 S. Ct. at 1341.

The circuit courts have divided on identifying the elements of a Fourth Amendment malicious prosecution claim. One fundamental question

in each circuit has been whether all common law malicious prosecution elements must be met, or whether, in the Fourth Amendment context, malice is unnecessary given that "[t]he Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry." *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 184 (4th Cir. 1996) (quoting *Graham v. Connor*, 490 U.S. 386, 399, 109 S. Ct. 1865, 1873 n.5 (1989)). *See also Nieves v. McSweeney*, 241, F.3d 46, 53 (1st Cir. 2001); *Gallo v. City of Philadelphia*, 161 F.3d 217, 223–24 (3d Cir. 1998). Following *Thompson*, the circuit split remains in place.

Before this court's en banc decision in *Castellano v. Fragozo*, our circuit had determined that "the elements of the state-law tort of malicious prosecution and the elements of the constitutional tort of 'Fourth Amendment malicious prosecution' are coextensive." *Gordy v. Burns*, 294 F.3d 722, 725 (5th Cir. 2002), *abrogated by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003); *see, e.g.*, *Castellano*, 352 F.3d at 961 (Jones, J., concurring). Consequently, plaintiffs in the Fifth Circuit had to prove six elements to prevail on a constitutionalized malicious prosecution claim. *Gordy*, 294 F.3d at 727. The elements included "(1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) malice; and (6) damages." *Id.*[14] Given *Thompson*'s clear recognition of the constitutional tort of malicious prosecution, overruling our precedent in *Castellano*, the rule

---

[14] In Texas, actual innocence was also required. But as discussed, *Thompson* holds that no affirmative indication of innocence is necessary to prove a Fourth Amendment malicious prosecution claim. *Thompson*, 142 S. Ct. at 1341.

iterated in *Gordy* is reinstated and parties asserting a Fourth Amendment malicious prosecution claim under § 1983 must prove the above elements, in addition to the threshold element of an unlawful Fourth Amendment seizure.[15] *See Thompson*, 142 S. Ct. at 1337 n.2.

But we do not remand for a determination of whether Armstrong's constitutional claim is sufficiently pled because the district court considered and rightly dismissed Armstrong's Louisiana malicious prosecution claim, which requires the same six elements as enumerated in *Gordy*. *See Lemoine v. Wolfe*, 168 So. 3d 362, 367 (La. 2015). Both claims fail to meet at least elements (2) and (5). Because Armstrong has not plausibly alleged that the defendants suppressed, fabricated, or destroyed evidence, she has not plausibly alleged that the defendants were the cause of Ford's prosecution. Moreover, Armstrong has not plausibly alleged facts showing the malice of any defendant. Accordingly, both her constitutional and her Louisiana malicious prosecution claims were properly dismissed.

e. *Conspiracy*

In addition, Armstrong alleges that "the Law Enforcement Defendants and McCormick, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights." In a similar vein, Armstrong's suppression allegations often state that the Law Enforcement Defendants all "agreed to suppress" the various reports. "In order to prevail on a section 1983 conspiracy claim, a plaintiff must establish (1) the existence of a conspiracy involving state

---

[15] Importantly, because an unlawful seizure is the threshold element, *see Thompson*, 142 S. Ct. at 1337 n.2, if the prosecution is supported by probable cause on at least one charge, then a malicious prosecution claim cannot move forward.

action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990). Armstrong's conspiracy claim was properly dismissed because she has not plausibly pled any underlying constitutional deprivation by the defendants. *See Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019) ("No deprivation, no § 1983 conspiracy.").

f. *Failure to Intervene*

Armstrong also alleges that "one or more of the individual Law Enforcement Defendants or McCormick stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so." A failure to intervene claim against a police officer requires that the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) is present at the scene of the constitutional violation; (3) has a reasonable opportunity to prevent the harm; and (4) chooses not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). The district court correctly found that "the claim lacks detail as to which of the Defendants did what, whether any Defendant knew of the misconduct, or who was present at the commission of the misconduct." Armstrong's claim does not reference the specific conduct of any particular defendant as constituting failure to intervene. The district court properly dismissed this claim.

No. 21-30210

g. *Intentional Infliction of Emotional Distress*

Armstrong also brought a state-law claim for intentional infliction of emotional distress. Such a claim requires (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991).

Just as Armstrong fails to adequately plead bad faith (for her destruction-of-evidence claim) or malice (for her malicious-prosecution claim), she also fails to adequately allege extreme and outrageous conduct. "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* Armstrong's allegations do not go that far. Nor does she allege facts suggesting that the defendants "desired to inflict severe emotional distress or knew that severe emotional distress would be certain." *Id.* This claim was properly dismissed.

h. *Negligence*

Rounding things out, Armstrong brought a traditional negligence claim. Louisiana uses the typical reasonable-person standard to assess an individual's liability for negligence. *See Lawrence v. Sanders*, 169 So. 3d 790, 795 (La. App. 2 Cir. 2015) ("Duty is defined as the obligation to conform to the standard of conduct associated with a reasonable person in like circumstances."); La. Civ. Code Art. 2315. For the same reasons that Armstrong did not adequately plead constitutional violations due to the defendants' suppression, fabrication, and destruction of evidence, she also fails to plead sufficient factual matter to show that they violated the standard

27

No. 21-30210

of care of a reasonable officer.[16]  The district court thus properly dismissed this claim.

## IV. Conclusion

Accordingly, the district court's judgment is AFFIRMED.

---

[16] Louisiana's state qualified immunity statute would also likely stand in the way of Armstrong's recovery on her state-law claims. *See* La. Rev. Stat. § 2798.1(B) ("Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties."); *Rombach v. Culpepper*, 2021 WL 2944809, at *9 (5th Cir. Jul. 13, 2021) (unpublished) (in § 1983 and *Monell* suit, affirming dismissal of pendant state-law claims based on § 2798.1).