REVISED

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 2, 2020

Lyle W. Cayce
Clerk

No. 19-11272

Basic Capital Management, Incorporated;
Transcontinental Realty Investors, Incorporated;
Michael J. Quilling, as Court Appointed Receiver for
American Realty Trust Incorporated,

*Plaintiffs—Appellants*,

*versus*

Dynex Capital, Incorporated; Dynex Commercial,
Incorporated, *also known as* DCI Commercial Incorporated,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:17-CV-1147

Before King, Stewart, and Southwick, *Circuit Judges*.
King, *Circuit Judge*:

After years of litigation in the Texas state courts, Plaintiffs-appellants won a $55 million judgment against Dynex Commercial, Inc. Unable to collect that judgment, Plaintiffs filed a lawsuit against Dynex Commercial, Inc. and Dynex Capital, Inc., alleging fraudulent-transfer and alter-ego

No. 19-11272

claims. The district court dismissed Plaintiffs' second amended complaint with prejudice on the grounds that the fraudulent-transfer claim is time-barred, and the alter-ego claim is barred by *res judicata*. We AFFIRM.

## I.

In the late 1990s, Dynex Commercial, Inc. ("DCI") agreed to lend Plaintiffs $160 million to finance commercial and multifamily properties. When DCI failed to fulfill its loan commitment, Plaintiffs brought a lawsuit in 1999 in Texas state court against DCI and its indirect parent company, Dynex Capital, Inc. ("Dynex Capital"). In 2004, a jury returned a verdict in Plaintiffs' favor. The trial court, however, granted DCI and Dynex Capital's motions for judgment notwithstanding the verdict and ordered that Plaintiffs "take nothing" from DCI and Dynex Capital. Plaintiffs appealed the trial court's judgment as to DCI, though not as to Dynex Capital. After several appeals, the Texas Supreme Court reversed the trial court. On remand, in 2015, judgment was entered in favor of Plaintiffs for over $55 million dollars against DCI, which was the "sole remaining defendant" at the time.

In April 2017, as part of their efforts to enforce the judgment following post-judgment discovery, Plaintiffs brought a new lawsuit in Texas state court once again against both DCI and Dynex Capital. DCI and Dynex Capital removed the case to federal court on the basis of diversity jurisdiction. Because DCI has no assets, Plaintiffs seek to recover from Dynex Capital by alleging that, in 2000, DCI fraudulently transferred twenty-five commercial loans and security interests to Dynex Capital and that DCI was Dynex Capital's alter ego. The district court dismissed Plaintiffs' claims *twice* without prejudice and with leave to amend. After Plaintiffs filed their second amended complaint, DCI and Dynex Capital again moved to dismiss, arguing that the fraudulent-transfer claim is time-barred and the alter-ego claim is barred by *res judicata*. After providing Plaintiffs with three bites at the

No. 19-11272

proverbial apple, the district court agreed with DCI and Dynex Capital and dismissed Plaintiffs' second amended complaint with prejudice. Plaintiffs then filed a timely notice of appeal.

## II.

We review the district court's ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) de novo. *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"[D]ismissal under Rule 12(b)(6) may be appropriate based on a successful affirmative defense," provided that the affirmative defense "appear[s] on the face of the complaint." *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006). Judicially noticed facts may also be considered in ruling on a motion to dismiss. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011). "A district court's use of judicial notice under Federal Rule of Evidence 201 is reviewed for abuse of discretion." *Id.*

As an initial matter, we must first determine whether the district court's use of certain judicially noticed facts in ruling on the 12(b)(6) motion was appropriate. Specifically, the district court took judicial notice of Dynex Capital's 2002 Form 10-K annual report (the "Form 10-K") and the proceedings and record of the 1999 state-court litigation (the "state-court record").

Federal Rule of Evidence 201 allows a district court to take judicial notice of a "fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be

accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The district court "may take judicial notice at *any* stage of the proceeding." Fed. R. Evid. 201(d) (emphasis added). And if there remained any doubt about whether "any stage of the proceeding" included the motion-to-dismiss stage, our precedents have resolved that doubt, explaining that "[w]hen reviewing a motion to dismiss, a district court 'must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Funk*, 631 F.3d at 783 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *see also Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996).

In this case, as the district court correctly observed, the Form 10-K and the state-court record "are all publicly available governmental filings and the existence of the documents, and the contents therein, cannot reasonably be questioned." Therefore, the Form 10-K and the state-court record fall squarely within the ambit of Rule 201(b).

Plaintiffs, however, take issue with the district court's consideration of the Form 10-K and state-court record at the motion-to-dismiss stage. According to Plaintiffs, although Rule 201 may incant the words "any stage of the proceedings," at the motion-to-dismiss stage, a district court "must not go outside the pleadings" with one exception. Plaintiffs argue that this sole exception exists when a defendant attaches documents to a motion to dismiss that are "referred to in the plaintiff's complaint and are central to its claim." In support of their argument, Plaintiffs rely on *Scanlan v. Texas A&M Univ.*, 343 F.3d 533 (5th Cir. 2003). But their reliance on *Scanlan* is misplaced because *Scanlan* did not involve properly judicially noticed facts. 343 F.3d at

537. Thus, Plaintiffs' argument fails. As discussed above, Rule 201(d) expressly provides that a court "may take judicial notice at *any* stage of the proceeding," and our precedents confirm judicially noticed facts may be considered in ruling on a 12(b)(6) motion. *See Funk*, 631 F.3d at 783; *Lovelace*, 78 F.3d at 1017–18.

Therefore, in ruling on the 12(b)(6) motion, "the district court appropriately used judicial notice." *Funk*, 631 F.3d at 783. As a result, against the backdrop of Plaintiffs' complaint and the properly judicially noticed Form 10-K and state-court record, we turn to whether Plaintiffs' claims are time-barred or precluded by *res judicata*.

## III.

Plaintiffs bring a fraudulent-transfer claim under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), TEX. BUS. & COM. CODE ANN. § 24.001 *et. seq.* Specifically, Plaintiffs allege that Dynex Capital intended to defraud them by stripping DCI of all of its assets while the state-court litigation was ongoing. In support of this claim, Plaintiffs point to twenty-five loan transfers from DCI to Dynex Capital in 2000.

Under TUFTA, a plaintiff must bring a fraudulent-transfer claim "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." TEX. BUS. & COM. CODE ANN. § 24.010(a)(1). We have made an *Erie* guess that the one-year period begins to run when the plaintiff knew of or could reasonably have discovered the transfer *and* its fraudulent nature. *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 195 (5th Cir. 2013).

In this case, Plaintiffs filed their lawsuit in April 2017. Accordingly, if Plaintiffs knew of or could reasonably have discovered the transfers of the

No. 19-11272

twenty-five loans and their fraudulent nature before April 2016, then the fraudulent-transfer claim is time-barred. Below, we first address whether Plaintiffs knew of or could reasonably have discovered the transfers before turning to whether they knew or could reasonably have discovered the allegedly fraudulent nature of the transfers.

## A.

Whether Plaintiffs knew of or could reasonably have discovered the transfers before April 2016 is fairly straightforward. First, in March 2002, in the Form 10-K, Plaintiffs were at least made aware of the fact that DCI was transferring loans to Dynex Capital. Specifically, the Form 10-K disclosed that DCI and Dynex Capital had a "funding agreement" under which DCI transferred certain commercial mortgage loans to Dynex Capital, and that Dynex Capital "paid DCI none, $288[1], and $2,147, respectively, under this agreement for the years ended December 31, 2001, 2000 and 1999." Second, during opening statements in the state-court litigation in January 2004, Plaintiffs' counsel argued to the jury that "every loan made by [DCI] ended up in Dynex Capital's hands." This statement implies that Plaintiffs were aware of transfers of assets from DCI to Dynex Capital. Third, Plaintiffs have admitted that as early as February 2004 they "researched and printed out every UCC filing found online that reflected assets owned by [DCI]" and that "[t]hese searches covered transactions as far back as the late 1990's through February 9, 2004." All of the transfers that Plaintiffs complain about occurred in 2000, so Plaintiffs' thorough research of DCI's secured interests from 1999 to 2004 would have provided Plaintiffs with notice of the transfers

---

[1] All amounts are in thousands of dollars.

at issue. Therefore, Plaintiffs knew of or reasonably could have discovered the transfers at least by February 2004, if not earlier.

**B.**

As discussed above, knowledge of the transfers does not end our inquiry. The fraudulent-transfer claim will only be time-barred if Plaintiffs also knew of or reasonably could have discovered the fraudulent nature of the transfers before April 2016. For the reasons that follow, we agree with the district court that Plaintiffs reasonably could have discovered the allegedly fraudulent nature long before April 2016.

First, in the Form 10-K, Dynex Capital disclosed that as of December 31, 2001, DCI "has no assets but has asserted counterclaims" in the state-court litigation. This type of disclosure should have, at the very least, prompted additional diligence and review of where DCI's assets went. The argument that this sentence is buried in the Form 10-K is unavailing. The disclosure is clearly made in the Notes to the Consolidated Financial Statements, and a plaintiff, exercising reasonable diligence, would have reviewed the annual report of a company it was suing for millions of dollars. Second, beyond the Form 10-K, Plaintiffs have admitted that their thorough review in 2004 of all of DCI's UCCs revealed "evidence of potentially Tens of Millions of Dollars in secured positions on real estate that were titled in the name of Dynex Commercial and/or Dynex Capital, as well as assignments from Dynex Commercial to Dynex Capital." This discovery would have prompted a reasonable plaintiff to inquire why these assignments occurred within the company's corporate structure.

Third, even disregarding the public disclosures in the Form 10-K and the UCCs, Plaintiffs were told in a January 2003 deposition that DCI was no longer operating and had not held any loans since 2001. Upon hearing that a

defendant no longer has any assets, especially one being sued for millions of dollars, a reasonable plaintiff would make some sort of inquiry into the situation. And since discovery in the state-court litigation was ongoing when the deposition occurred, asking a few follow-up questions at the deposition, for example, would likely have borne fruit. *See Biliouris ex rel Biliouris v. Patman*, 751 F. App'x 603, 605 (5th Cir. 2019) (concluding that a plaintiff could have reasonably discovered the fraudulent nature of a transfer because the plaintiff received constructive notice of the transfer's existence while discovery was ongoing). Indeed, as in *Biliouris ex rel Biliouris v. Patman*, the alleged fraud in this case involves transferring all of a defendant's assets while litigation is pending without receiving anything in return. In this respect, the alleged fraud here is readily distinguishable from the complicated Ponzi scheme at issue in *Janvey v. Democratic Senatorial Campaign Committee*. *See* 712 F.3d at 196 (discussing that the Ponzi scheme would not have been "readily evident . . . to anyone not privy to the inner workings of the [relevant entities]" and that discovering the fraud required, among other things, an analysis of the books and records by a certified public accountant).

Finally, Plaintiffs' assertion that pre-judgment discovery regarding DCI's ability to satisfy a judgment would not have been permissible is unavailing. There are at least two other ways that the transfers from DCI to Dynex Capital would have been "relevant to the subject matter of the pending action": (1) the relationship between DCI and Dynex Capital and (2) the possibility of adding a fraudulent-transfer claim. Tex. R. Civ. P. 192.3. Thus, following the January 2003 deposition—or even as part of that deposition—Plaintiffs could have taken discovery about where DCI's assets went. In any event, Plaintiffs could have reasonably discovered the allegedly fraudulent nature long before April 2016.

No. 19-11272

Therefore, we agree with the district court that the fraudulent-transfer claim is time-barred.

**IV.**

Plaintiffs' alter-ego claim is barred by *res judicata*. "[D]ismissal under Rule 12(b)(6) is appropriate if the res judicata bar is apparent from the pleadings and judicially noticed facts." *Kahn v. Ripley*, 772 F. App'x 141, 142 (5th Cir. 2019) (citations omitted).

Under Texas law, which applies when federal courts determine the preclusive effect of Texas judgments, *res judicata* "bars assertion of a claim in a subsequent case when: (1) there is a prior final judgment on the merits by a court of competent jurisdiction; (2) the parties in the second action are the same or in privity with those in the first action; and (3) the second action is based on the same claims as were raised or could have been raised in the first action." *Weaver v. Tex. Capital Bank, N.A.*, 660 F.3d 900, 906 (5th Cir. 2011).

The parties agree that the first two elements of *res judicata* have been met in this case, so the only dispute concerns whether Plaintiffs' alter-ego claim could have been brought in the state-court litigation. To determine what claims could have been raised in the first action, Texas follows a "transactional approach," under which "a final judgment on an action extinguishes the right to bring suit on the transaction, or series of connected transactions, out of which the action arose." *Barr v. Resolution Trust Corp. ex rel. Sunbelt Fed. Sav.*, 837 S.W.2d 627, 631 (Tex. 1992). This determination "requires an analysis of the factual matters that make up the gist of the complaint." *Id.* at 630. "Any cause of action which arises out of those same facts should, if practicable, be litigated in the same lawsuit." *Id.*

Plaintiffs' alter-ego claim could have and should have been brought in the state-court litigation. The gist of the state-court litigation and the instant litigation revolves around liability for breach of the $160 million loan agreement. In the state-court action, Plaintiffs successfully held DCI liable for that breach. They tried and failed, however, to hold Dynex Capital jointly and severally liable for that breach. Nevertheless, in their second amended complaint, Plaintiffs allege that "Dynex Capital should be held jointly and severally liable for the judgment debt of [DCI] owed to Plaintiffs because Dynex Capital and [DCI] constituted a single business enterprise and carry out a common business objective." And Plaintiffs go on to allege that "Dynex Capital used the corporate form of [DCI] to perpetrate a fraud on Plaintiffs by inducing Plaintiffs to enter into the $160 Million Commitment . . . on the pretext that [DCI] was and would be capable of fulfilling its obligations . . . ." Regardless of how Plaintiffs repackage their claim, they are attempting to relitigate Dynex Capital's liability for breach of the $160 million loan agreement *after* a Texas court has already entered judgment in favor of Dynex Capital—a judgment that has been left unchallenged as to Dynex Capital. *Res judicata* bars this type of claim.

And Plaintiffs are aware that the state-court litigation and the action before us share the same nucleus of operative facts. Indeed, in opposing removal of this case to federal court, Plaintiffs argued that the alter-ego claim asserted against Dynex Capital is "simply an extension and continuation of the claims asserted against [DCI]."

Although Plaintiffs include allegations about events that occurred after the state-court litigation began, i.e. the transfer of DCI's assets to Dynex Capital, those allegations do not mean that Plaintiffs were unable to bring their alter-ego claim in the state-court litigation. *See Barr*, 837 S.W.2d at 631 ("Discovery should put a claimant on notice of any need for alternative

pleading. Moreover, if success on one theory becomes doubtful because of developments during trial, a party is free to seek a trial amendment."). In this case, while the state-court litigation was pending, Plaintiffs were aware of the fact that DCI had no assets and had engaged in a series of transfers of its assets to Dynex Capital. These facts would have put a reasonable plaintiff on notice of the need for alternative pleading, including the possibility of an alter-ego claim. Indeed, in the state-court litigation, Plaintiffs alleged that Dynex Capital was liable because it "made representations to [Plaintiffs] that [DCI] was willing, ready, and able, and had the financial stability and resources, to provide $160,000,000 in loans to [Plaintiffs]." Further, at trial, Plaintiffs (unsuccessfully) attempted to "amend [the complaint] to formally seek damages directly from Dynex Capital" for breach of contract on the theory that Dynex Capital ratified the loan commitment. *See Nilsen v. City of Moss Point*, 701 F.2d 556, 563 (5th Cir. 1983) ("[B]oth courts and commentators agree that theories which were the subject of an untimely motion to amend, filed in the earlier action, 'could have been brought' there."). Plaintiffs' failure to raise an alter-ego claim against Dynex Capital during the state-court litigation does not mean that they can raise such a claim now.

Therefore, we agree with the district court that the alter-ego claim is barred by *res judicata*.

## V.

Plainly put, Plaintiffs first attempted to recover from DCI and Dynex Capital in state court more than twenty years ago. When the trial court entered take-nothing judgments in favor of DCI and Dynex Capital, Plaintiffs could have challenged that judgment as to both DCI and Dynex Capital. By the time the case returned to the trial court on remand from the Texas

No. 19-11272

Supreme Court, DCI was the only remaining defendant, and the opportunity to hold Dynex Capital liable had long since come and gone.

We AFFIRM the district court's judgment.