# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 8, 2024

Lyle W. Cayce
Clerk

————————

No. 23-10395

————————

Jantzen Verastique; Dondi Morse; Parker Nevills;
Yolanda Dobbins; David Baker, *also known as* Dabi Baker;
Maggie Little,

*Plaintiffs—Appellants*,

*versus*

The City of Dallas, Texas; Dallas County;
Dallas County Sheriff's Office,

*Defendants—Appellees*.

————————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:22-CV-1182

————————————————————————

Before Smith, Elrod, and Graves, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

Plaintiffs[1] are self-described "lawful and peaceful protestor[s]" who sued various governmental entities and officers[2] under 42 U.S.C. § 1983,

————————————————

[1] Jantzen Verastique, Dondi Morse, Parker Nevills, David Baker, Maggie Little, and Yolanda Dobbins.

[2] Including, *inter alia*, the City of Dallas, Dallas County, and the Dallas County Sheriff's Office.

No. 23-10395

seeking money damages for myriad alleged constitutional violations—all stemming from their participating in the "George Floyd" demonstrations in Dallas. The district court dismissed their claims against the City, the County, and the Sheriff's Office. On appeal, plaintiffs contend that the district court erred in dismissing their municipal liability claims against the City. We affirm.

I.

*A.    Background*

In 2020, major metropolitan areas were consumed by demonstrations following the release of a video depicting the well-known George Floyd incident in Minneapolis. Texas was not spared: Some of its cities suffered, *inter alia*, "widespread [and] severe damage, injury, and property loss."[3] In Dallas, demonstrations ultimately devolved into "several days of riots, destruction of property, and assaults on police."[4]

"[I]ndividuals[,] bent on rioting and looting[,]" "rov[ed] throughout the downtown area," and "[d]estruction quickly followed as [they] began damaging businesses, police vehicles, and starting fires." AFTER ACTION REPORT at 10, 19. Agitators, ignoring orders to disperse, "began inciting the crowd to confront officers." *Id.* at 12. Numerous stores—including "[t]wo [f]irearm businesses"—were looted and burglarized. *Id.* Rioters jumped onto police vehicles and threw "various objects including bricks and

---

[3] Governor Greg Abbott, Proclamation (May 31, 2020), tinyurl.com/mvxk222c.

[4] DALLAS POLICE DEPARTMENT, GEORGE FLOYD PROTESTS AFTER ACTION REPORT 4 (August 14, 2020), tinyurl.com/5n9braye [hereinafter After-Action Report]. Plaintiffs referred extensively to the After-Action Report in their complaint, *see* ROA.38–39, and in responding to motions to dismiss, *see* ROA.314 & nn.9–10. We "must consider . . . documents incorporated into the complaint by reference." *Jackson v. City of Hearne*, 959 F.3d 194, 204–05 (5th Cir. 2020) (cleaned up).

rocks at officers." *Id.* at 10.   Swarms of rioters commandeered I-35E, "forcing motorists to swerve in order to avoid striking pedestrians and eventually stopping traffic." *Id.*

All told, the riots inflicted extreme economic harm on Dallas—with one initial damage estimate ascertaining "over five million dollars of property destruction . . . in the central business district alone." *Id.* at 7.

## B.     *Plaintiffs Participate in the Dallas Demonstrations*

Verastique and Morse, two participants, joined a crowd of demonstrators marching somewhere on or alongside Reunion Boulevard.[5]  As the crowd approached I-35E, Verastique and Morse allegedly saw "a [b]lack woman on the ground crying out in pain."   They further claim that officers from the Dallas Police Department ("DPD") began arresting demonstrators who had "helped th[at] [b]lack woman to her feet."

Verastique and Morse responded by approaching, and engaging with, those officers—allegedly in an "attempt[] to explain to the officers that the [demonstrators] had not committed any crime[s]."   That prompted one of the officers—Roger Rudloff—to order Verastique to "stop and place her hands in the air."   Allegedly, she "immediately complied and remained a lawful peaceful protestor."   She was arrested by Rudloff after being subdued with a less-than-lethal PepperBall round.   Rudloff then ordered Morse to the ground and arrested her as well.

While Rudloff was effecting Verastique's and Morse's arrests, Nevills

---

[5] Verastique's and Morse's precise position in relation to Reunion Boulevard is somewhat unclear.   Their briefing on appeal states that they were walking on "a grassy slope near the interstate."   But, when asked at oral argument whether "they were on the field or the road," plaintiffs' counsel acknowledged that "[t]here's dispute . . . about where [his] clients were located."

approached. Nevills alleges that, running toward the three individuals, he was "hoping to render aid" to Verastique. Nevills was then subdued with PepperBall rounds and arrested.

Little and Baker participated in demonstrations occurring in another part of Dallas. They ended up in a parking garage after tear gas was deployed to disperse the crowds. They allege that DPD officers prevented them from leaving. After repeatedly asking for the officers' names and badge numbers, they further allege they were roughed up and arrested.

Baker was released from custody shortly thereafter on account of the alleged injuries. The other plaintiffs spent one night in jail. All were charged with various criminal offenses initially, though all charges were dropped approximately two weeks later.[6]

Plaintiffs sued, as relevant here, the City of Dallas; Dallas County; and the Dallas County Sheriff's Office, raising myriad claims under § 1983. All three defendants filed motions to dismiss for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). Granting the motions, the district court dismissed plaintiffs' claims with prejudice, and they appeal.

## II.

Grants of Rule 12(b)(6) motions to dismiss are reviewed *de novo*. *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023). Though we accept "all well-pled facts as true, drawing 'all reasonable inferences in favor of the non-moving party,'" we do not "'presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement.'" *Id.* (quoting *Harmon v. City of*

---

[6] Including charges for "obstruction of a roadway" and "riot participation."

No. 23-10395

*Arlington*, 16 F.4th 1159, 1162–63 (5th Cir. 2021)). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and to survive a motion to dismiss. *Johnson v. Harris Cnty.*, 83 F.4th 941, 945 (5th Cir. 2023) (quoting *Pena v. City of Rio Grande City*, 879 F.3d 613, 618 (5th Cir. 2018)).

## III.

On appeal, plaintiffs challenge only the dismissal of their *Monell* claims against the City.[7] Those allege that the City is liable for constitutional violations resulting from its (A) failing adequately to discipline its police officers and (B) promulgating General Order 609.00, an official—but allegedly facially unconstitutional—policy relating to mass arrests.

To hold a municipality liable under § 1983, a plaintiff must "show that '(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right.'" *Johnson*, 83 F.4th at 946 (quoting *Pena*, 879 F.3d at 621). An unofficial policy or custom, such as "the decisions of a government's law-makers, the acts of its policymaking officials, and practices," can suffice for purposes of showing the existence of an "official policy"—but only if it is "so persistent and widespread as to practically have the force of law." *Id.* (cleaned up).

### A.    *Failure to Discipline*

Plausibly to plead a *Monell* claim in the context of a failure-to-discipline claim, plaintiffs must show (1) that the city's failure to discipline amounted to deliberate indifference and (2) a causal link between the failure to discipline and the violation of their rights. *See Armstrong*, 60 F.4th at 277.

---

[7] They do not contest the dismissal of their claims against the County and the Sheriff's Office, or any of Dobbins's claims. Thus, any issues relating to those claims are forfeited. *See Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 397 (5th Cir. 2021).

So, to survive dismissal, plaintiffs must cite sufficiently numerous prior incidents, each of which includes specific facts that are sufficiently similar to those alleged here. *See Johnson*, 83 F.4th at 946–47; *see also Armstrong*, 60 F.4th at 276. Plaintiffs utterly fail to make that requisite showing.

### 1. Persistent and Widespread Practice

Though the complaint lists nineteen incidents involving one officer, those incidents do not constitute "*any* pattern of conduct—much less a pattern of similar violations." *Johnson*, 83 F.4th at 947. Most are conclusory and devoid of critical factual enhancement. What scant factual details plaintiffs provide *affirmatively proves* that all nineteen incidents are wholly inapposite to the case at hand.

For starters, of the nineteen incidents, eight not only are devoid of factual support but are also inscrutably vague. *See id.* Indeed, the complaint describes those eight in *one* sentence: "Between 1998 and 2000, another eight complaints were filed against Defendant Rudloff for alleged physical and verbal abuse." Where did those incidents take place? Did all eight involve both physical and verbal abuse? How did the abuse occur? What even are the alleged constitutional violations? How was each complaint resolved? Plaintiffs do not say, and we have not a clue.

Needless to say, those eight incidents—vague and barren of factual support—are patently incapable of showing the existence of any pattern of conduct. *Id.* So, even before we consider the eleven incidents that remain, already unsustainable is plaintiffs' assertion that "the[ir] pleadings . . . provided highly specific information detailing each [incident]."

Turning to those eleven: A hodge-podge of unrelated allegations, they are but isolated examples of, at most, deficient performance or bad judgment—not to mention their stark factual dissimilarities to what the plaintiffs allegedly experienced.

*First*, and fatally, none of those remaining incidents includes sufficient factual detail. Plaintiffs, for example, cite five incidents allegedly involving a flashlight or nightstick. Some are listed incident-by-incident. But all still remain totally devoid of critical facts. What prompted the encounters? Did the individuals threaten Rudloff with physical harm? Were they attempting to resist arrest?

Once again, the complaint does not say, and we are left with nary an answer. So vague and so conclusory, the eleven remaining incidents plainly do not "raise a right to relief above the speculative level." *Id.* at 946 (quoting *Armstrong*, 60 F.4th at 270).

*Second*, and worse still, none even involves facts remotely related to the specific violations in plaintiffs' complaint. Four include no allegation of physical conduct.[8] None involved the use of "less-than-lethal" weapons or occurred in the context of a large-scale, multi-day, city-wide riot that became so violent and deadly as to trigger a statewide disaster declaration.[9]

The complaint's threadbare descriptions of those incidents only further prove the point. In one, the complaint states that Rudloff "and other officers allegedly slammed a man's head into the ground while arresting him for public intoxication." But plaintiffs did not allege they were intoxicated. Another describes an incident where Rudloff allegedly choked a man and struck him with the palm of his hand. Not once did plaintiffs allege they were choked. Also described are two car-related incidents, one involving a traffic stop and the other a carjacking. Yet, at the time they were arrested, plaintiffs

---

[8] Indeed, in describing one of those incidents, plaintiffs state that "Rudloff was 'rebuked' for 'making lewd comments about a dead woman in a conversation over a police radio with other officers.'" Offhand banter between employees cannot establish that the City was deliberately indifferent to allegations of excessive force.

[9] *See* Abbott, *supra* note 3.

were marching on foot.  So, plainly, they were not driving a car—much less one that had been reported stolen.

All nineteen incidents described in the complaint lack "similarity and specificity" and do not "point to the specific violation in question." *Edwards v. City of Balch Springs*, 70 F.4th 302, 313 (5th Cir. 2023) (cleaned up). Therefore, they cannot plausibly establish a pattern of constitutional violations.  The district court correctly dismissed plaintiffs' *Monell* claims premised on the City's failing adequately to discipline its officers.

### 2. Deliberate Indifference

Assume, *arguendo*, that all nineteen incidents listed in the complaint are sufficiently specific and similar.  Even so, plaintiffs' failure-to-discipline claim still fails on an alternate ground.  Nothing in their complaint suggests that it was "obvious that 'the highly predictable consequence' of not supervising its officers was that they 'would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk.'" *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Brown v. Bryan Cnty.*, 219 F.3d 450, 461 (5th Cir. 2000)).

According to plaintiffs, DPD investigated Rudloff's conduct nineteen times in twenty-three years.  They observe, however, that only five of those investigations resulted in disciplinary actions—none of which, in their opinions, was sufficiently severe.  Further, they allege that those disciplinary consequences were functionally offset when DPD subsequently "showered [Rudloff] with praise" and granted him more supervisory responsibilities. Based on those allegations, plaintiffs aver that DPD was constructively aware of—but deliberately indifferent to—a department-wide pattern of constitutional rights violations.  Not so.

The complaint includes insufficiently numerous incidents to create a pattern capable of providing constructive notice.  It took twenty-three years

to amass the nineteen incidents mentioned in the complaint. Plaintiffs posit that the protracted time span works in their favor. In their view, the fact that the incidents occurred over two decades further evinces a consistent pattern of failed discipline. Incorrect.

Given a constant number of incidents, a longer time span yields a *lower rate* of violations—*militating against* constructive notice. Nineteen allegations over the span of twenty-three years yields a mere annualized incident rate of 0.826. In other words: Plaintiffs—at most—show that, for over two decades, Rudloff, on average, received *fewer than one accusation of misconduct per year*.

Further cutting against plaintiffs' claim of a consistent pattern of failed discipline are the factors our caselaw has identified as "relevant to determining whether a series of incidents can be called a pattern," *Peterson*, 588 F.3d at 851–52 (citing *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002)). Those factors—such as department size and number of arrests—provide the context necessary to evaluate whether an alleged department-wide pattern is so obvious as to impart constructive notice. *See id.* at 851.

Absent those contextual factors, it is *impossible* to identify the existence of a pattern—much less one that imparts constructive notice. Given a constant number of incidents, the percentage of conduct supporting a pattern of illegality shrinks as the size of the police department or the number of arrests increases.[10] Accordingly, depending on context, an identical number of incidents can strongly support—or render "truly uncompelling"—an

---

[10] To the point where the allegedly unconstitutional incidents form but a tiny sliver of the arrests made in the coterminous period, making the sample "just too small." *See Pineda*, 291 F.3d at 329.

inference of a pattern of illegality. *Pineda*, 291 F.3d at 329.[11]

Yet, inexplicably, the complaint eschews discussing either factor. Lacking any context or frame of reference, it trades rational analysis for a random shot in the dark. Plaintiffs have no clue whether nineteen incidents over twenty-three years is sufficiently frequent to be obvious in the context of DPD. So, though they purport to discover a pervasive pattern of failure to discipline, in reality they have alleged nothing at all.

Had plaintiffs taken a more reasoned approach, they would have acknowledged that DPD employs 3,200 to 3,300 officers and serves one of the largest cities in the nation.[12] "Given the department's size, and absent any evidence of its total number of arrests during the same time period," only one conclusion can reasonably follow: Nineteen incidents over twenty-three years does not support any inference of a department-wide pattern of illegality.[13]

In sum, the nineteen incidents are not sufficiently similar, specific, or numerous. Therefore, the district court correctly dismissed plaintiffs' failure-to-discipline claim.

## B.    *General Order 609.00*

Plaintiffs attempt to establish the first and third *Monell* elements[14] by

---

[11] *See also id.* ("Eleven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces.").

[12] As appellee's counsel explained at oral argument.

[13] *Peterson*, 588 F.3d at 851; *see also id.* at 851 & n.4 ("twenty-seven incidents in four years is not sufficient evidence of a pattern rising to the level of a policy" given the department's employing "more than fifteen-hundred officers" (cleaned up)).

[14] Namely, (1) an official policy that was (3) the moving force behind the violation of a constitutional right. *See Johnson*, 83 F.4th at 946.

alleging that General Order 609.00 is unconstitutional on its face because it (1) permits DPD officers "to conduct arrests as they saw necessary to quell a civil unrest incident," with (2) no further "guidance or restrictions on arrests." Put another way, they fault the Order for (1) committing certain decisions to the discretion of municipal employees and (2) failing comprehensively to explain every hypothetical stricture that might touch on the legality of an arrest.

For purposes of a *Monell* claim, an official, written policy is facially unconstitutional if it "affirmatively allows or compels unconstitutional conduct." *Edwards*, 70 F.4th at 309 (citation omitted). General Order 609.00 does neither. Indeed, plaintiffs' own characterization of General Order 609.00 describes—to a tee—a *facially valid* policy. An official policy that merely (1) "commits some decisions to an individual officer's on-the-scene discretion" or (2) "gives some detailed instructions while omitting others" does not "affirmatively allow[] or compel[]" unconstitutional conduct.[15] *Edwards*, 70 F.4th at 309.

General Order 609.00 in no way abrogates the applicability or effectiveness of pre-existing constitutional protections. *See id.* at 310. It does not render DPD officers any less capable—or any less obligated—to act in accordance with the Constitution's commands.[16] Officers are not prohibited from exercising the Order's grants of discretion in a constitutionally valid manner. Nor are they required to disregard restrictions or limitations not expressly

---

[15] Unless "those features stem from the policymaker's deliberate indifference." *Edwards*, 70 F.4th at 309; *see also Peterson*, 588 F.3d at 850. But plaintiffs never allege that General Order 609.00 was so enacted. So that theoretical possibility is of no moment.

[16] After all, discretion can be exercised constitutionally, and omitted instructions can be obtained elsewhere. *See id.* (noting that a recitation of "every jot and tittle of the applicable caselaw . . . would produce a behemoth" of a policy "free of any practical use").

mentioned in the text of the Order itself. Indeed, counsel for Verastique admitted at oral argument that the Order "doesn't specifically state [that officers] don't need probable cause" and that it "does not prohibit" "individualized findings of probable cause." Thus, plaintiffs' facial attack on the Order lacks merit.

For good reason too: Plaintiffs' assault on General Order 609.00 cannot be squared with the limitations that § 1983 places on the scope of municipal liability. Under their theory, a municipality's official policy *must* be unconstitutional on its face (1) if any one employee's "mere exercise of discretion . . . *could* give rise to a constitutional violation" or (2) if it fails expressly to provide, in detail, *any* "guidance that *might* have averted a constitutional violation." *Edwards*, 70 F.4th at 309–10 (cleaned up) (emphasis added). And since a "facially unconstitutional policy's mere existence satisfies the moving-force requirement that is *Monell*'s third element," *id.* at 308 (citation omitted), plaintiffs' theory would permit recovery from municipalities merely on the basis of an "individual violation perpetrated by a local government employee"[17]—thereby making municipal liability "indistinguishable from *respondeat superior* liability," *Edwards*, 70 F.4th at 309 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988)).

But that cannot be, for *Monell* claims predicated on *respondeat superior* liability are wholly alien to the plain meaning of § 1983.[18] The statute does not "impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Brown*, 520 U.S. at 403 (citation and internal quotation marks omitted).

_____

[17] *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (cleaned up).

[18] *Id.* (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)).

Accordingly, a municipality is liable only for its *own* illegal acts.[19] Yet, that's precisely what plaintiffs' theory does: It holds municipalities liable for the unsanctioned and unordered acts of *others*. *See id.* Unsurprisingly, that yields an end-state that the text of § 1983 will not bear. *Piotrowski*, 237 F.3d at 578.

In sum, plaintiffs have not plausibly pleaded that General Order 609.00 is unconstitutional on its face. Dismissal of their claims premised on facial invalidity was therefore proper.[20]

\*    \*    \*    \*    \*

Plaintiffs' claims against the City of Dallas are utterly meritless. The judgment of dismissal is AFFIRMED.

---

[19] That is, acts "which the municipality has *officially sanctioned or ordered*." *Edwards*, 70 F.4th at 308 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)); *see also Piotrowski*, 237 F.3d at 578 ("isolated unconstitutional actions by municipal employees will almost never trigger [municipal] liability" (citations omitted)).

[20] Plaintiffs also assert that former DPD Chief Reneé Hall was the City's policymaker whose actions resulted in their alleged injuries. But their complaint does not plead sufficiently any unconstitutional policy or custom, so "the specific identify [*sic*] of the policymaker is neither here nor there." *Pena*, 879 F.3d at 623 n.15 (cleaned up). Accordingly, we pretermit further consideration of that assertion and, therefore, decline to address the district court's reference to *Groden v. City of Dallas*, 826 F.3d 280 (5th Cir. 2016), which held that "the final policymaker for the [C]ity of Dallas is the Dallas city council," *id.* at 286 (citing *Bolton v. City of Dallas*, 541 F.3d 545, 550 (5th Cir. 2008) (per curiam)).

JAMES E. GRAVES, JR., *Circuit Judge*, concurring in part and dissenting in part:

The plaintiffs allege a long-running pattern of violent misdeeds—a total of nineteen incidents—by a Dallas police officer. They argue that Dallas policymakers should have known about the officer's violent history and disciplined him accordingly. Thus, they argue, the city is liable for the officer's attack on them at a protest against police brutality following the murder of George Floyd.

According to the majority, the plaintiffs' claims against the city fail. They fail because even if the officer *did* violently attack them, he did not beat them with his nightstick, or beat them with his flashlight, or beat them while they were intoxicated, or choke them, or shoot at them while they were driving a car. That is, he did not do to them what he allegedly did to others. Thus, the majority says, the city could not expect that he presented a risk of further harm to the community.

I concur in the majority's conclusion that the plaintiffs' claim based on General Order 609.00 is foreclosed by *Edwards v. City of Balch Springs*, 70 F.4th 302 (5th Cir. 2023). But the majority's disposition of the plaintiffs' failure to discipline claim is not supported by the facts or the law. Accordingly, I respectfully dissent from that part of the majority's opinion.

I.

At this stage of the case, we must take the plaintiffs' allegations as true and "draw all reasonable inferences in [their] favor. *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc).

The majority begins its recitation of the facts with information culled selectively from the police department's After-Action Report, cited in the complaint. It sets a scene of "rioting and looting" and includes details about

rioters who threw bricks at officers, burglarized gun stores, and forced drivers off the highway. It then describes plaintiffs Jantzen Verastique and Dondi Morse as "two participants."

But there are no allegations connecting the plaintiffs to those events. In their complaint, the plaintiffs describe themselves as "lawful and peaceful protestor[s]."[1] They told police that they never threw objects at officers and "were not around anyone else who did." Rather, Verastique, who works at a nonprofit serving at-risk children, told a reporter that she marched that day out of concern for her two Black sons.[2] She carried a sign that said, "Not my sons, not this mom, enough is enough."[3]

The majority then addresses the plaintiffs' actual allegations, starting with Verastique and Morse's encounter with Dallas police officer Roger Rudloff. The majority notes that Verastique was trying to explain to officers, including Rudloff, that a demonstrator the officers had surrounded had not done anything wrong. Rudloff ordered Verastique to stop and put her hands in the air, which she did. Then, the majority says, she "was arrested by Rudloff after being subdued with a less-than-lethal PepperBall round."

What Verastique actually alleged was the following: As she stood with

––––––––––––––––––––––––––

[1] "[T]he right to engage in peaceful and orderly political demonstrations is, under appropriate conditions, a fundamental aspect of the 'liberty' protected by the Fourteenth Amendment . . . ." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 161 (1969) (HARLAN, J., concurring).

[2] Miles Moffeit et al., *'I felt like my chest was on fire': Photo shows Dallas police officer shooting protester with pepper-ball gun*, THE DALLAS MORNING NEWS, Aug. 9, 2020, https://www.dallasnews.com/news/investigations/2020/08/09/i-felt-like-my-chest-was-on-fire-photo-shows-cop-blasting-a-peaceful-protester-with-a-pepper-ball-gun-at-close-range/. The complaint cites to this article and one other that is cited below. Documents incorporated into the complaint are properly examined on a motion to dismiss. *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 589 (5th Cir. 2020).

[3] *Id.*

her hands in the air, Rudloff shot her in the chest, at close range, with a rifle loaded with non-lethal chemical projectiles. A photograph in the complaint shows the moment immediately afterward, with Rudloff pointing his rifle at Verastique as she lays on the ground facing away from him. "I felt like my chest was on fire," Verastique told a reporter. "I didn't know what that weapon was. I was terrified."[4]

Nothing in the complaint or even in the majority's retelling indicates that Verastique presented a threat such that she needed to be "subdued" at all. Even Rudloff later told a reporter that he fired on Verastique only because "she wasn't doing what we told her to."[5] Morse later described the scene as "like an ambush."[6]

In a similarly abridged manner, the majority relays that plaintiff Parker Nevills was "subdued with PepperBall rounds." It omits Nevills's allegation that *after* he was "subdued," while he was standing still with his hands behind his back, Rudloff kneed him in the groin for no apparent reason.[7] Rudloff also called Nevills a "faggot," according to Nevills, Verastique, and a witness.[8]

Next, the majority writes that plaintiff Dabi Baker was "roughed up"

_____

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *The Dallas Morning News* reported that while Nevills was putting his arms behind his back, police body camera footage showed Rudloff "shov[ing] his knee into [Nevills's] stomach." Miles Moffeit & Cassandra Jaramillo, *Charges against cop to be weighed*, The Dallas Morning News, Nov. 12, 2021, https://www.dallasnews.com/news/investigations/2021/11/12/grand-jury-to-weigh-criminal-charges-against-dallas-officer-who-fired-pepper-balls-at-protester/.

[8] Moffeit et al., *supra* note 2.

by officers. Her allegations are significantly more detailed: that officers "slammed [her] to the ground with such force that they broke her glasses, which cut into the bridge of her nose"; that they "beat her"; that she "suffered severe injuries to her chest." All because, Baker alleged, she asked the officers for their names and badge numbers.

The plaintiffs alleged that there were nineteen misconduct complaints against Rudloff that spanned twenty-three years. Sixteen allegedly involved violence against a member of the public.

These are the allegations that the majority describes as "isolated examples of, at most, deficient performance or bad judgment":

> In July 1998, Defendant Rudloff allegedly threatened to beat a Black man with a flashlight. According to the sworn statement the man gave to DPD Internal Affairs, Defendant Rudloff told him that he used the flashlight to "beat n—s in the head."

> In October 1998, another complaint alleged that Defendant Rudloff choked a driver after stopping her for failure to use a turn signal.

> . . .

> In January 1999, after responding to a disturbance call involving a man with a gun, Defendant Rudloff handcuffed an unarmed Black man, allegedly striking him with the palm of his hand and choking him.

> [Two 1999 lawsuits alleged that] Defendant Rudloff assaulted Black men with his flashlight.

> In November 1999, Defendant Rudloff beat Keith Burkins so severely with a flashlight that Burkins required seven staples in his head. A senior corporal who witnessed the assault reported Defendant Rudloff to a supervisor, but Defendant Rudloff . . . claimed Burkins hit his head on a sidewalk.

17

. . .

In 2005, Defendant Rudloff was sued in his individual capacity for assault and battery of and use of excessive force against [a man who] alleged that two officers . . . transported him from the scene of his arrest (one of whom the City identified as Defendant Rudloff) [and] assaulted him by repeatedly striking his face and battering him with a nightstick. [The case was settled two weeks before trial.]

In 2009 . . . Defendant Rudloff was yet again accused of excessive force when he and other officers allegedly slammed a man's head into the ground while arresting him for public intoxication.

In 2012, Defendant Rudloff and two other officers fatally shot a carjacking suspect, firing about thirty rounds into his car. Defendant Rudloff was "admonished" by a supervisor after the shooting for violating DPD policy by using a firearm for which he was unqualified.[9]

Allegedly, there were ten other complaints of misconduct against Rudloff that are not detailed in the complaint. The police department only disciplined Rudloff for five of the nineteen complaints, the plaintiffs allege. The harshest punishment was imposed after investigators concluded that Rudloff lied about beating a Black man with a flashlight in 1999. He was suspended for ten days. But he also allegedly received more supervisory responsibilities. In fact, he was promoted twice—ultimately to a position where he supervised certain law enforcement activities at the protest.

The substance of the plaintiffs' allegations is this: Officers, principally

_____

[9] One of the articles incorporated into the complaint explains that the carjacking suspect "put [his] vehicle in reverse and drove it at [the officers]" before the officers fired. It reported that a grand jury cleared Rudloff of wrongdoing. Moffeit et al., *supra* note 2.

Rudloff, responded to the plaintiffs' compliance with their orders by assaulting or shooting them. And Rudloff's actions were only the latest instance in his long and conspicuous history of subjecting Dallas residents to brutal uses of force.

II.

The majority next finds three reasons to dismiss the plaintiffs' allegations against the city. It concludes that Rudloff's past misdeeds are not alleged with enough specificity, are not similar enough to the plaintiffs' own experiences, and were not frequent enough to put the city on notice of a problem. None of those conclusions are supported by the law.

### A.    *Specificity of the allegations*

First, the majority concludes that the plaintiffs' allegations are not specific enough. To successfully allege that the city should be held liable for Rudloff's misconduct, the plaintiffs were required to plead deliberate indifference—that is, a pattern of city actions "so persistent and widespread as to practically have the force of law." *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). That can include the persistent failure to discipline officers who violate the constitutional rights of members of the community. *Piotrowski v. City of Houston*, 237 F.3d 567, 581–82 (5th Cir. 2001). But the plaintiffs' allegations of such a failure to discipline must be specific and non-conclusory. *Johnson v. Harris County*, 83 F.4th 941, 946–47 (5th Cir. 2023).

In my view, the complaint satisfies that standard. It combines a more general allegation about the large number of excessive force complaints with specific allegations about several of those complaints. The pleading standard for deliberate indifference cases is no higher than it is for other cases. *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993). When that usual standard applies, we require only enough

details to make the plaintiff's basic claims plausible, not to affirmatively prove them. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 768 (5th Cir. 2019) (explaining that "scrutinizing" plaintiffs' allegations is "more suited to the summary judgment phase").

Yet the plaintiffs' allegations of Rudloff's past actions are not specific *enough*, the majority says, because the allegations do not affirmatively state whether Rudloff's actions were justified. Maybe his victims threatened him first, the majority speculates, or maybe they were resisting arrest.

That analysis is wrong. We are supposed to make inferences in the plaintiffs' favor, not speculate about how the defendants might overcome their allegations. *See Morgan*, 659 F.3d at 370. The reasonable inference here is there is no justification for an officer to beat a man with a flashlight just because he wanted to "beat n—s in the head," or to beat another man so badly as to require stitches and then lie about it, or to slam a person's head into the ground while making an intoxication arrest. Yet at every turn, the majority sews doubt into well-pled allegations by alternately assuming Rudloff's actions were provoked or that they can be chalked up to "deficient performance or bad judgment." If that is true, the city may prove it at summary judgment or trial. Until then, the plaintiffs need only allege that Rudloff's history of violence, which the complaint describes as "use[s] of excessive force" and "allegations upon allegations of constitutional violations," put the city on notice of a serious problem. They have done so.

B.      *Similarity of the allegations*

Next, the majority concludes that the plaintiffs' allegations about Rudloff's past acts are not similar enough to his actions here to constitute a pattern that would have put the city on notice. As the majority writes, past violations must be "similar" to constitute an actionable pattern. *See Connick*,

563 U.S. at 61 (2011).

The complaint satisfies that standard as well. The plaintiffs allege that Rudloff committed years of aggressive, unnecessary, and unjustified violence against members of the community. Their own experiences are just the latest examples. Moreover, if the allegations are true, they raise serious questions about why Rudloff was allowed to continue patrolling the streets.

Yet the majority discounts those egregious allegations because they did not specifically involve less-than-lethal projectiles or did not "occur[] in the context of a large-scale, multi-day, city-wide riot." Alternatively, the plaintiffs were not intoxicated, were not beaten with a nightstick, and were not choked. Our cases simply do not support that punctilious approach. Past violations must be "similar"; they need not be identical.

In *Connick*, plaintiffs brought a claim based on a prosecutor's failure to disclose a crime lab report. *Connick*, 563 U.S. at 57. The Supreme Court implied that a pattern of failure to disclose "physical or scientific evidence of *any kind*" would have been sufficient to show deliberate indifference. *Id.* at 62–63 (emphasis added).

The plaintiffs' allegations demand a conclusion quite the opposite of the majority's. Because Rudloff's alleged unconstitutional actions were not limited to a single context, or a single means of violence, they show a propensity to use excessive force in any context, by any method.

C.    *Frequency and seriousness of the allegations*

Last, the majority explains that Rudloff's "annualized incident rate" of committing needless violence against members of the community is too low to put the city on notice. It bases that concept on *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009). The majority's approach was arguably appropriate in that case. There, the plaintiffs, to show deliberate

21

indifference, pointed to twenty-seven complaints of excessive force *against the Fort Worth police department*. *Id.* We said that in a force of 1,500 officers, in a city with 67,000 incidents of crime per year, twenty-seven complaints may not be enough to put the city on notice of a problem. *Id.* at 852.

This case is different. The plaintiffs point to nineteen complaints of excessive force *against a single officer*. When one officer is the problem, the city is not faced with a scattering of bad apples across a large police force. And indeed, there are allegations here that the department knew about Rudloff's violations. In short, *Peterson* does not support the majority's analysis. The plaintiffs allege a pervasive pattern of failure to discipline Rudloff for uses of excessive force. I would therefore conclude that the plaintiffs sufficiently alleged deliberate indifference on the part of the city.

## III.

The majority does not reach the other elements of the plaintiffs' failure to discipline claim. To sustain it, the plaintiffs were also required to plead the involvement of an official policymaker and to plead that the city's practice of failing to discipline Rudloff was the "moving force" in their injuries. *Hutcheson v. Dallas County*, 994 F.3d 477, 482 (5th Cir. 2021).

The plaintiffs alleged that former Dallas police chief Reneé Hall was the city's official policymaker on policing. The district court concluded that *Groden v. City of Dallas*, 826 F.3d 280 (5th Cir. 2016), foreclosed that argument. But while *Groden* declared that "the final policymaker for the [C]ity of Dallas is the Dallas city council," *id.* at 286, it did not address the argument the plaintiffs make: that the city council delegated policymaking authority to Hall. The plaintiffs plausibly pled that a delegation occurred. *See Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168 (5th Cir. 2010).

The moving force inquiry requires a "direct causal connection . . . between the policy and the alleged constitutional deprivation." *Mason v.*

*Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 280 (5th Cir. 2015) (citation omitted). If the city had addressed Rudloff's alleged string of violent behavior by, for example, firing him, it would have prevented Verastique and Nevills's injuries. It is also plausible that the city's failure to discipline Rudloff emboldened him to commit more wanton violence. And it is also plausible that the example emboldened other officers, including the one who allegedly assaulted Baker in the parking garage. *See Gentile v. County of Suffolk*, 926 F.2d 142, 152–53 (2d Cir. 1991).

## IV.

I would conclude that the plaintiffs plausibly pled that the city failed to discipline Rudloff for repeated use of excessive force, that its failure constituted deliberate indifference to a risk of further harm, and that such failure was the moving force in the plaintiffs' injuries. I respectfully dissent from that part of the majority's opinion.