**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 25-1675

_____

In re: OUR ALCHEMY, LLC et al.,
Debtors

GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly
administered bankruptcy estates of Our Alchemy, LLC and Anderson Digital, LLC,
Appellant

v.

ANDERSON MEDIA CORPORATION; ANCONNECT, LLC, f/k/a Anderson
Merchandisers, LLC; ANDERSON MANAGEMENT SERVICES, INC.; CHARLES
C. ANDERSON, JR., a/k/a Charlie Anderson; JAY R. MAIER; BILL LARDIE;
CHUCK TAYLOR

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 1:24-cv-00243)
District Judge: Honorable Colm F. Connolly

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on January 20, 2026

Before: RESTREPO, FREEMAN, and MASCOTT, *Circuit Judges*

(Opinion filed: January 30, 2026)

_____

OPINION[*]

_____

FREEMAN, *Circuit Judge.*

The Chapter 7 Trustee for the jointly administered bankruptcy estates of two debtors appeals the District Court's order affirming the Bankruptcy Court's grant of summary judgment in an adversary proceeding. For the following reasons, we will affirm.

**I.**

In July 2015, ANConnect, LLC sold its video line of business—including the entity Anderson Digital, LLC—to Our Alchemy, LLC. For that transaction (the "2015 Sale"), ANConnect received over $29 million in cash from Our Alchemy.

ANConnect later began winding down operations and liquidating its assets. It sold off its other lines of business, and between May and August of 2016, it transferred millions of dollars to two of its related entities: Anderson Media Corporation ("Anderson Media") and Anderson Management Services, Inc ("AMS").

In July 2016, Our Alchemy and Anderson Digital, LLC (together, "Debtors") filed for Chapter 7 bankruptcy. In June 2018, the Trustee of Debtors' estates commenced an adversary proceeding (the "2018 Action") against ANConnect and other companies. The

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

Trustee claimed that the 2015 Sale was fraudulent, and he sought to recover funds Our Alchemy had transferred to ANConnect for that sale.

On September 13, 2018, the Trustee—along with two of his attorneys and his accountant—met with ANConnect officials to explore settlement of the 2018 Action. During the settlement meeting, ANConnect's Chief Financial Officer (CFO) said ANConnect had sold all of its operating assets, ceased operations, and satisfied its debts, leaving it with such limited cash that it was "judgment proof." App. 1770. Because Our Alchemy had given ANConnect so much cash for the 2015 Sale, the Trustee and his team were concerned about whether ANConnect had "upstreamed" any money to its related entities. App. 1771. One of the Trustee's attorneys inquired about upstreaming, and ANConnect's CFO responded that ANConnect had transferred "a million dollars or two" to its related entities, Anderson Media and AMS.[1] *Id.* The Trustee and his attorney asked ANConnect's CFO for documentation of those cash transfers, but the CFO refused to provide it. Given the context, the Trustee's attorney believed ANConnect officials were posturing for settlement discussions rather than making factual statements.

In March 2021, ANConnect produced documents to the Trustee in connection with the 2018 Action. The Trustee learned from those documents that ANConnect had transferred nearly $24 million to Anderson Media and AMS in the summer of 2016. Based on those documents, in December 2021 the Trustee brought a separate adversary

---

[1] The parties dispute how much money the CFO said ANConnect had transferred to Anderson Media and AMS, but all agree he said it was at least one million dollars.

proceeding (the "2021 Action") against ANConnect, Anderson Media, and AMS (together, "the Anderson Parties"), claiming that the 2016 transfers were fraudulent.

Following discovery in the 2021 Action, the Bankruptcy Court determined that the Trustee's fraudulent-transfer claim was barred by the statute of limitations, so it granted summary judgment in favor of the Anderson Parties. The District Court affirmed the Bankruptcy Court's order, and the Trustee timely appealed to us.

**II.**[2]

The Uniform Fraudulent Transfer Act ("UFTA") governs the timeliness of the Trustee's claim against the Anderson Parties.[3] A fraudulent-transfer action must be brought "within 4 years after the transfer was made . . . or, if later, within 1 year after the transfer . . . was or could reasonably have been discovered by the claimant." Del. Code tit. 6, § 1309(1); *accord* Tex. Bus. & Com. Code § 24.010(a)(1).

The allegedly fraudulent transfers at issue here occurred in 2016, more than four years before the Trustee brought the 2021 Action. Thus, the statute of limitations started

---

[2] The Bankruptcy Court had jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. The District Court had jurisdiction to review the Bankruptcy Court's order pursuant to 28 U.S.C. § 158(a)(1). We have jurisdiction pursuant to 28 U.S.C. § 158(d)(1).

We review an order granting summary judgment de novo. *In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 503 (3d Cir. 2021). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view all facts and draw all reasonable inferences in the non-moving party's favor. *In re Weinstein*, 997 F.3d at 503.

[3] The parties agree that we need not determine whether Delaware or Texas law governs this case because both states have adopted the UFTA and its statute of limitations. *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007) ("If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary." (emphasis omitted)).

4

to run when the Trustee had inquiry notice of the facts giving rise to the claim—that is, when he knew, or, through the exercise of reasonable diligence, could have discovered "the fraudulent nature of the transfers for which [he] seeks relief." *JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1240 (Del. Ch. 2019); *see also Burkhart v. Genworth Fin., Inc.*, 250 A.3d 842, 859–60 (Del. Ch. 2020) ("Plaintiffs were required to file their claims no more than one year after persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued*, would lead to the . . . the general fraudulent scheme." (citation modified)); *see also Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 194–95 (5th Cir. 2013) (addressing Texas law requiring "that a fraudulent-transfer claim be filed within one year of when the *fraudulent nature* of the transfer was or reasonably could have been discovered").

Here, the clock started to run on September 13, 2018—the date of the settlement meeting. That was when the Trustee either discovered or reasonably could have discovered the challenged transfers and their allegedly fraudulent nature.

Because Our Alchemy had made such a large cash payment to ANConnect for the 2015 Sale, the Trustee and his attorney were concerned about ANConnect's upstreaming. Moreover, at the time of the settlement meeting, the Trustee was already litigating the 2018 Action, in which he claimed that the 2015 Sale was fraudulent. This gave him reason to suspect that ANConnect's other transfers might be fraudulent. Then, during the settlement meeting, the Trustee learned that ANConnect purported to have low cash

reserves after winding down and had transferred "a million dollars to two" to its related entities. App. 1771.

In these circumstances, ANConnect's statements during the settlement meeting would have prompted a reasonable party to further inquire into ANConnect's cash transfers to its related entities. *See Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 588, 591 (5th Cir. 2020) (determining under Texas's UFTA that "[u]pon hearing that a defendant no longer has any assets, especially one being sued for millions of dollars, a reasonable plaintiff would make some sort of inquiry into" the defendant's transfers to its related entities); *see also Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311, 315–16 (Tex. App. 2012) (concluding that when a claimant learned that the defendant sold an asset affecting the claimant's rights, that "would prompt a reasonably diligent [claimant] to seek further information about the sale proceeds").

True, during the settlement meeting, the Trustee requested documentation of the transfers, and ANConnect did not comply. But that does not excuse the Trustee's failure to further investigate the transfers between the settlement meeting and the Trustee's March 2021 receipt of ANConnect's document production. *See Basic Cap. Mgmt.*, 976 F.3d at 591 (concluding that, where the parties are already involved in litigation, a reasonably diligent plaintiff would use discovery to investigate suspicions of fraudulent transfer claims); *Burkhart*, 250 A.3d at 860 (determining that the plaintiff had a duty to investigate potential fraudulent transfer claims where there were "red flags" that defendant was "siphoning funds"); *see also Cadle Co. v. Wilson*, 136 S.W.3d 345, 352–53 (Tex. App. 2004) (deeming claim time-barred where plaintiff learned of a transfer but

6

did not investigate its fraudulent nature until a deposition given years later). The Trustee failed to exercise reasonable diligence.[4]

The Trustee's arguments to the contrary are unavailing. First, the Trustee protests that ANConnect's CFO understated the size of the 2016 transfers during the settlement meeting, and he argues that the scope of a fraudulent transfer is relevant to inquiry notice. In support, the Trustee points to language in *JPMorgan Chase* that a plaintiff was not "aware of the scope of [the defendant's] dividend payments or of [the defendant's] financial condition at the time so as to put [the plaintiff] on notice that the dividends may have been fraudulent in nature." 213 A.3d at 1241. But in *JPMorgan Chase*, the mere fact of the dividends did not alert the plaintiff to potential fraud. Instead, it was the sheer size of the dividends, plus information about the defendant's financial condition, that put the plaintiff on inquiry notice. *Id.* at 1241–42. Here, by contrast, the settlement meeting put the Trustee on inquiry notice of potential fraudulent transfers in the amount of one to two million dollars. The Trustee does not (and cannot) argue that fraudulent transfers of that size would not have supported his cause of action, so the larger size of the actual transfers has no bearing on when the statute of limitations began to run.

Second, the Trustee argues that the Anderson Parties stonewalled when he tried to take discovery in the 2018 Action. But he points to those parties' conduct in 2020—more

---

[4] The Trustee notes that his attorney viewed ANConnect's CFO statements during the settlement meeting as posturing. But reasonable diligence is an objective inquiry, so the attorney's subjective view is not relevant. *See Janvey v. GMAG*, L.L.C., 592 S.W.3d 125, 130 (Tex. 2019); *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 96 (Del. Ch. 2023).

than one year after the settlement meeting put him on inquiry notice. That conduct did not affect his ability to seek additional information within a year of the settlement meeting.

Third, the Trustee argues that the Bankruptcy Court and the District Court engaged in improper factfinding about when he had inquiry notice of his claim. They did not. "[I]f reasonable minds could not differ about the conclusion to be drawn from the facts in the record, then the start of the limitations period may be determined as a matter of law." *Cadle Co.*, 136 S.W.3d at 352. Such is the case here.

Fourth, the Trustee argues that his involvement in the 2018 Action (which challenged the 2015 Sale as fraudulent) is not relevant to whether the settlement meeting put him on inquiry notice of the facts underlying the 2021 Action. In his view, there can be no connection because the two actions challenge different fraudulent transfers. He is incorrect. His knowledge of ANConnect's financial circumstances—including its receipt of over $29 million in cash in 2015—is plainly relevant to whether he had inquiry notice of a fraudulent transfer. Indeed, the Trustee's attorneys attested that the 2015 Sale is what caused him to inquire about upstreaming in the first instance.

Finally, the Trustee argues that the Bankruptcy Court's and District Court's decision will have a chilling effect on settlement discussions. He argues that parties should be permitted to treat settlement discussions as puffery, not fact. But his argument is misplaced. ANConnect did not merely "cry poor," as the Trustee contends is typical during settlement discussions. App. 1771. Instead, ANConnect disclosed having transferred one or two million dollars in cash to its related entities during a period when

8

the Trustee suspected ANConnect of upstreaming the millions of dollars in cash it had received months earlier.  Reasonable diligence required the Trustee to investigate ANConnect's disclosure notwithstanding that it was made during a settlement meeting.

*     *     *

For the foregoing reasons, we will affirm the District Court's order.